IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | CHAPTER SEVEN |
| RONALD WIEDNER, DEBTOR | : | BANKRUPTCY NO.: 5-03-bk-55937 |
| OFFICE OF THE U.S. TRUSTEE, MOVANT | : | |
| vs. | : | |
| RONALD WIEDNER, RESPONDENT | : | |

*************************************************************************

| | | |
|---|---|---|
| IN RE: | : | CHAPTER SEVEN |
| JEFFREY McCREARY DONNA McCREARY, DEBTORS | : | BANKRUPTCY NO.: 5-03-bk-51301 |
| OFFICE OF THE U.S. TRUSTEE, MOVANT | : | |
| vs. | : | |
| JEFFREY McCREARY DONNA McCREARY, RESPONDENTS | : | |

# **OPINION**

The United States Trustee has filed Motions to Dismiss in the above-captioned cases which I have taken under advisement in order to determine whether the evolution in developing case law should cause me to rethink earlier positions I have taken with regard to cases under 11 U.S.C. § 707(b). In *In re Barnikow,* 211 B.R. 176 (Bankr. M.D.Pa. 1997) and *In re Zaleta,* 211

B.R. 178 (Bankr. M.D.Pa. 1997), I concluded that a debtor's case should not be dismissed under § 707(b) unless the debtor was capable of paying all of his/her debt within a reasonable time. One of the cases pending before me, but not captioned herein, is on remand from the District Court which requires me to apply a broader "totality of the circumstances" to that case. *In re Welch,* Docket No. 3:02-cv-1909 (M.D. of Pa.) at Doc. #22 and #24. While most circuit courts have embraced this standard in evaluating § 707(b) cases, our circuit has not yet spoken on this topic.

Under the law of the case doctrine, it is certainly true that I must apply the "totality of circumstances" test to the facts in *In re Welch*. Nevertheless, a decision by a district judge in a multi-judge district may be persuasive but is not compelling. *Threadgill v. Armstrong World Industries, Inc.*, 928 F.2d 1366, 1371 (3rd Cir. 1991)("there is no such thing as 'the law of the district'.").

The totality of the circumstances inquiry has been embraced by the majority of circuit courts that have examined dismissals under § 707(b). *First USA v. Lamanna (In re Lamanna)*, 153 F.3d 1, 3 (1st Cir. 1998); *Kornfield v. Schwartz (In re Kornfield)*, 164 F.3d 778, 783 (2nd Cir. 1999); *Green v. Staples (In re Green),* 934 F.2d 568, 570 (4th Cir. 1991); *In re Behlke* 358 F.3d 429, 433 (6th Cir. 2004); *In re Stewart* 175 F.3d 796, 806 (10th Cir. 1999).

The Eighth Circuit has rejected the totality of circumstances approach. *United States Trustee v. Harris,* 960 F.2d 74, 77 (8th Cir. 1992).

This lack of harmony is primarily a product of the vague language utilized by § 707(b), which indicates dismissal is appropriate where granting relief would be a "substantial abuse" of chapter seven.

[m:\users\cathy\wp8docs\opinions\Wiedner_McCreary.wpd]     2

Case 5:03-bk-55937-JJT    Doc 42    Filed 10/14/05    Entered 10/14/05 11:28:57    Desc
                          Main Document       Page 2 of 15

While our circuit has not yet addressed this § 707(b) issue, it is not entirely unfamiliar with the use of the totality of the circumstances test with regard to the dismissal of a bankruptcy, having adopted this methodology in § 1307(c) motions seeking dismissal "for cause" including "lack of good faith" (*In re Lilley,* 91 F.3d 491 (3d Cir. 1996)) as well as § 1112(b). *In re SGL Carbon Corp.,* 200 F.3d 154 (3rd Cir. 1999). In fact, our circuit, in a § 707(a) case, examined various factors including the accrual of large debt, no marked calamity, sudden loss of income, and the timing of divorce, to conclude that the burden of showing "good faith" shifted to the debtor. *In re Tamecki*, 229 F.3d 205 (3rd Cir. 2000)[1]. Although *Tamecki* did not reference the term "totality of the circumstances", the facts suggest it was the very inquiry made.

Sections 707(a), 1112(b), and 1307(c) contain similar language authorizing a bankruptcy court to dismiss cases, for cause, followed by a non-exclusive laundry list of shortcomings. As indicated, our circuit has consistently held that bad faith, or the lack of good faith, can result in dismissal of cases under those sections after considering various circumstances/factors.

In concluding that § 707(a) dismissal can be supported by a bad faith argument, the Third Circuit joins the Sixth Circuit in so holding. See *In re Zick*, 931 F.2d 1124, 1127 (6th Cir. 1991). This position contrasts sharply with the Fourth, Eighth, and Ninth Circuits that have concluded that bad faith is not a ground for dismissal under § 707(a). *In re Green*, 934 F.2d 568, 572 (4th Cir. 1991) (dicta); *In re Huckfeldt*, 39 F.3d 829, 832 (8th Cir. 1994); and *In re Padilla*, 222 F.3d 1184, 1191 (9th Cir. 2000).

Having made these observations, the above-captioned cases pending before me are

---

[1] *Tamecki* has been criticized by a leading treatise for "erroneously holding . . . that it is the debtor's burden to prove good faith once a motion has been filed calling the debtor's good faith into question." 6 Collier on Bankruptcy, ¶ 707.03[2] at 707-12 (15th ed. rev'd).

dismissal motions under § 707(a) and § 707(b). A review of § 707(a) is an apt starting point to begin to analyze the breadth of its companion section, § 707(b). If Congress meant to allow dismissal on grounds available in § 707(a), they could not have meant those same grounds to support dismissal under § 707(b). Such a construction would render the more recent amendment, § 707(b), redundant and, therefore, superfluous. *Mackey v. Lanier Collection Agency & Service*, 406 U.S. 825, 837, 108 S.Ct. 2182, 2189 (1988).

Initially, I note that a stated purpose of the Bankruptcy Act of 1898 was to "relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh . . . .," *Williams v. United States Fidelity & Guaranty Co.,* 236 U.S. 549, 554–555, 35 S.Ct. 289, 290, 59 L.Ed. 713 (1915). In providing same, a bankrupt is given "a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt . . . ." *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934). It has been said that the Bankruptcy Act was adopted with this very background and its provisions should be interpreted "in harmony with it so as to effectuate the general purpose and policy of the act." *Id.* at 245, 699.

Section 707 of the original Bankruptcy Reform Act of 1978 restated the general power of the bankruptcy court to dismiss cases "for cause". See, generally, 6 Collier on Bankruptcy, ¶ 707.LH[1] at 707-31 (15th ed. rev'd).

Section 707(a) reads identically with the original § 707 provision in the 1978 Bankruptcy Code.

> The legislative history of this section states: "The section does not contemplate, however, that the ability of the debtor ro repay his debts in whole or in part constitutes adequate cause for dismissal. House Report No. 95-595, 95th Cong., 1st Sess. (1977) 380; Senate Report No. 95-989, 95th Cong. 2d Sess. (1978) 94,

U.S. Code Cong. & Admin. News 18=978, pp. 5787, 6336."
*Matter of Nina Merchandise Corp.*, 5 B.R. 743, 746 (Bkrtcy. N.Y. 1980).

In 1984, Congress, frustrated with the significant increase in filings and pressured by the consumer credit industry, enacted § 707(b) to stem the tide. This section provided that the Court could dismiss a case if the debts were primarily consumer and granting relief would be a "substantial abuse" of the bankruptcy provisions.

> The adoption of section 707(b) was the result of a legislative compromise. Congress rejected attempts by the consumer credit industry to permit creditors to move for dismissal of cases on the basis that the debtor had an ability to pay debts. It also rejected the idea that a case should be dismissed simply because a debtor could pay a "reasonable portion" of his or her debts (defined as 50%), as well as the use of a five year period to determine whether such portion could be paid. The resulting section 707(b) is thus more narrow than the provisions originally sought by the consumer credit industry and targeted only at debtors who can pay their debts without difficulty. (Footnotes omitted)

6 Collier on Bankruptcy, ¶ 707.LH[2] at 707-32 (15th ed. rev'd)

> . . . some courts have found substantial abuses when substantial payments could be made, even if the payments are less than 100 percent. These cases ignore not only the language of the Senate Report . . ., but also the fact that Congress, in the legislative process leading to enactment of section 707(b), rejected consumer credit industry proposals that provided for dismissal of a chapter 7 case if a debtor could pay merely a "reasonable" or "substantial" portion of his or her debts.

6 Collier on Bankruptcy, ¶ 707.04[4] at 707-24 (15th ed. rev'd)

As I have observed, the "totality of circumstances" test has been embraced by the vast majority of courts that have considered dismissal under § 707(b). As applied in our Circuit, however, the application of the same totality of circumstances-approach to cases under §§ 707(a) and (b) would virtually mirror each other. This could not have been what Congress intended. Thus, this Court is confronted with the dilemma as to how §§ 707(a) and (b) can be applied while respecting the presumed intention of Congress that § 707(b) have "stand-alone" justification. Thankfully, this decision will have little impact beyond the parties, considering the

passage of the Bankruptcy Abuse Prevention and Consumer Protection and Consumer Protection Act of 2005.

I conclude, consistent with *Tamecki*, that a review of § 707(a) cases asking for dismissal for cause, shall take place under the totality of the circumstances with the exception that this review shall not include a consideration of the Debtor's monthly income and expenses.

Furthermore, I find that § 707(b) cases, regarding dismissal for substantial abuse, shall consider initially the Debtor's monthly income and expenses. Should the Debtor have significant excess income, I find that the burden should then shift to the Debtor to demonstrate that the excess income is justified under the "totality of circumstances" which may be different factors than would be considered under § 707(a).

I observe that the level of reasonable expenses is dependent on the components of those expenses, which level of expenses may vary from court to court. More apparent is the divergence of opinions as to what expenses are deemed "reasonable and necessary." There is little point to add to this controversy in light of the passage of the bankruptcy reform bill. Inasmuch as I agree with the court in *In re Attanasio* that "[t]he key to a fair review of a debtor's expenses and lifestyle is for the review to be based on publicly acknowledged, objective criteria, not on moral perspectives, subjective beliefs or life experiences of those making the review" *(In re Attanasio,* 218 B.R. 180, 210 (Bkrtcy. N.D.Ala. 1998)), I will initiate my review of "reasonable and necessary" expenses by comparing the debtor's actual expenses with the national criteria found in the Internal Revenue Service, Collection Financial Standards for Food, Clothing and other items, as well as the housing and utility allowance for the county and state

applicable and the allowable living expense for transportation.[2]

**Ronald A. Wiedner, Case No. 5-03-bk-55937**

The United States Trustee has filed a dismissal Motion under 11 U.S.C. §§ 707(a) and 707(b). Among those reasons alleged in support of dismissal, the Trustee references inaccurate schedules, unreasonable expenses, and substantial income.

It is clear that the schedules were inaccurate to some degree. Many of those inaccuracies revolve around rental properties in Illinois and Oklahoma. Gross income from those properties was not disclosed in the statement of affairs, rather, the net losses were identified. The contracts regarding the property manager were not disclosed originally. At the time of filing, the Debtor apparently intended to retain these properties and indicated such on his § 521 statement. He also identified the mortgage payments associated with these properties on his Schedule J. He has since surrendered these properties.

The Debtor is a network engineer for a cable company in Coudersport, Pennsylvania. The Illinois property was acquired in 1996 as his principal residence. Transcript of 7/16/2004 at 20 (Doc. #36). His family and his former spouse still live in that area. *Id*. at 19. In 1999, he moved to Oklahoma where he bought a home. At his then income level, he thought it best to rent the home to others to offset the mortgage. The Illinois property was to be transferred to his former spouse as a part of the property settlement. He has now resigned himself to allowing the properties to be foreclosed.

Amended Schedules I and J reflect a marginal difference of $48.96. Nevertheless, the

---

[2] Internal Revenue Service IRS.gov, Collection Financial Standards, http://www.irs.gov/individuals/article/0,,id=96543,00.html

[m:\users\cathy\wp8docs\opinions\Wiedner_McCreary.wpd]     7

United States Trustee questions the reasonableness of the expenses.

In connection with a review of whether the Debtor's filing constitutes a substantial abuse under § 707(b), I will compare the Debtor's expenses with the Internal Revenue Service, Collection Financial Standards for Food, Clothing and other items, Housing and Utilities standards, and Transportation standards. The Debtor has partial custody of his five year old child and, therefore, where applicable, I will select a midpoint between one and two person households. Referring to the IRS tables for an individual with *gross* monthly income in excess of $5,834, the allowance according to the National Standard of Food, Clothing, and other items for 1½ persons is $1116. The Housing and Utility Allowance in Potter County, Pennsylvania is $773. The Allowable Living Expenses for Transportation is $705. Total monthly allowable expenses would be $2,594. The Debtor claims current monthly expenses of $5,253.43. The record of these proceedings demonstrates ample reason to allow the actual monthly expenditure for transportation and vehicle of $1,045.43 (installment payment, automobile insurance and transportation expense). Considered by the Court was the geography of the region where the Debtor works as well as the location of his former spouse and family in Illinois. I also would concede that the $1,000 support payment should be allowed. Having said that, reasonable and necessary expenses would only elevate to $3,934.43. Deducting this sum from Debtor's *net* monthly income of $5,302.39 would leave $1,367.96 available to address the Debtor's obligations.

Having found that there is significant amount of excess income after allowing for "reasonable and necessary" expenses, I will apply the *Lamanna* factors, peculiarly relevant to *need,* to determine whether allowance should be given to more subjective matters that would

impact the court's decision. I do not view those factors as exclusive. Those factors include;

> whether the debtor enjoys a stable source of future income, whether he is eligible for adjustments of his debts through Chapter 13 of the Bankruptcy Code, whether there are state remedies with the potential to ease his financial predicament, the degree of relief obtainable through private negotiations, and whether his expenses can be reduced significantly without depriving him of adequate food, clothing, shelter and other necessities.

*In re Lamanna* 153 F.3d 1, 4 (1st Cir. 1998)

With this said, I find little rationale why eligibility for Chapter 13 relief should play any greater of a role than eligibility for Chapter 11, which would afford similar relief to those who may not financially qualify under the restrictions in 11 U.S.C. § 109(e) and, therefore, I shall consider adjustment of debt under any available chapter as worthy of discussion.

**Factor 1: Stable Source of Income**

Weidner identifies himself as a "top engineer" for Adelphia Communications with 24 hour responsibility. He is, apparently, a key employee in a major corporation and, as such, likely enjoys significant stability in his income stream.

**Factor 2: Eligibility for adjustment under Chapter 11 or 13**

As an individual with regular income and a debt limit within the parameters of 11 U.S.C. § 109(e), he is eligible for Chapter 13 relief.

**Factor 3: Availability of State Remedies**

No testimony was advanced as to the availability of state remedies at trial on this matter.

**Factor 4 Efforts at Private Negotiations**

No evidence of Debtor's attempts to secure credit counseling or arrange private negotiations with creditors was advanced at trial.

**Factor 5: Ability to Reduce Expenses**

Having applied the Internal Revenue Service guidelines heretofore, I conclude that there are no facts that would indicate a further reduction of expenses below the allowances to which I have referred.

After finding that there is a significant amount of income over reasonable and necessary expenses and no subjective factor that would indicate otherwise, I conclude that allowing Mr. Weidner to enjoy the benefits of Chapter 7would constitute a substantial abuse of the provisions of Chapter 7. I, therefore, dismiss the case, effective in ten days so as to allow the Debtor to convert to Chapter 13, should he desire.

**Jeffery and Donna McCreary, Case No. 5-03-bk-51301**

Jeffery and Donna McCreary filed a voluntary Chapter 7 petition on March 21, 2003.

The United States Trustee filed "United States Trustee's Motion to Dismiss Case Pursuant to 707(A) or (B)." See Doc. #12. A hearing was held and testimony was taken. After the record was closed, the Trustee's counsel indicated that he was withdrawing the claim based on § 707(b) and was only going to focus on § 707(a). See Electronic Record, Oct. 2, 2003 at 10:51:02-10:51:17.

The parties submitted briefs in support of their respective positions and oral argument was scheduled. See Proceeding Memo (Doc. #26), Brief in Support Doc. #29), and Brief in Opposition (Doc. #30). The matter was taken under advisement upon the conclusion of oral argument. See Proceeding Memo (Doc. #31).

Prior to filing for bankruptcy, Jeffrey McCreary was employed as an elementary school teacher in the state of New Jersey. Because he was not paid during the summer months, Mr.

McCreary worked odd jobs mowing lawns, tending bar, and waiting tables.

In 1994, the McCrearys built a home in an area they felt was a nice place to raise a family and a part of a reputable school district. The home's purchase price was from $120,000 to $130,000. The McCrearys obtained a $125,000 mortgage against the property.

Recognizing there was equity in their home, the McCrearys obtained a second mortgage of $60,000 in 1996. This money was used for home improvements.

The McCrearys also decided to start a family in 1996. This resulted in Donna McCreary taking two separate maternity leaves from 1996 through 1999. Prior to this leave, Ms. McCreary had an annual income in the upper $30,000 range. During this period, the McCreary's annual income was approximately $55,000 in 1998 and $62,000 in 1999. Their credit cards were often used as a supplement to their income so as to pay their bills.

The McCrearys also thought that it was in the family's best interest if Jeffrey started to work toward a master's degree in 1997. Although he had obtained a loan for this purpose, Jeffrey personally paid most of the costs associated with his studies.

In 1998, the McCrearys refinanced the first and second mortgages against their home. Their home was appraised at $275,000.00. Prior to this refinance, the McCrearys' unsecured obligations approximated between $80,000 to $100,000. In addition to the satisfaction of the first and second mortgages, the refinance decreased their unsecured debt to $20,000. The McCrearys' new monthly mortgage payment was $2,600.

The McCrearys refinanced their mortgage once again in 2000. However, the refinance was predicated on taking advantage of a lower interest rate. At the time of the refinance, their home was appraised at $250,000.00. Their monthly mortgage payment was reduced to $2,090 as

a result.

Until January 2002, the McCrearys had been current on all of their obligations. Realizing that their obligations were not decreasing despite regular payments, they sought assistance from a credit counseling organization in February 2002. The McCrearys agreed to participate in the program with the goal of lowering their interest rates and shortening the length of their loans. According to the program, they were obligated to make monthly payments of $1,340.00 to the organization. The McCrearys realized thereafter that their first payment had been applied towards fees associated with the program and not to their outstanding obligations. Unable to catch up, they became one month behind on their accounts. The McCrearys stopped making these payments in October 2002.

That same month, the McCrearys contacted a second credit counseling organization in an effort to settle their financial obligations. However, they were unable to meet the payment schedule proffered by the organization.

From April 2002 to April 2003, the McCrearys paid a total of $10,291 toward their credit card debts. They made a total of $2,368.27 in purchases on their credit cards from April 2002 to November 2002.

It was not until approximately February 2003 that the McCrearys first considered filing for bankruptcy.

At the time the petition was filed, Jeffrey had been employed for a little over a year as a principal for an elementary school with a gross monthly salary of $5,676.34 or $68,116.08 annually. As of the date of the hearing, his gross annual salary had increased to $71,150.00. He holds a bachelor of science degree in elementary education and a master's degree in school

administration.

Donna was employed as a guidance counselor at the time of filing with a gross monthly income of $3,794.65 or $45,535.80 annually. However, her income has decreased by $5,000 annually when she changed employers post-petition.

Although it did not appear to be in their best interests overall, the McCrearys reaffirmed their mortgage obligation. According to the terms of this agreement, this allowed them to bring their mortgage current and reduce the interest rate.

## DISCUSSION

In contrast to the Wiedner case, the Motion against the McCreadys is grounded specifically in § 707(a), and not § 707(b). In short, this is not a "substantial abuse" case as that term is used in § 707(b). In regard to § 707(a), our circuit has concluded that once "good faith" is put at issue, the burden of demonstrating good faith in the bankruptcy filing would shift to the debtor. The United States Trustee focuses on the accrual of $120,000 worth of debt between 1998 and 2002. The Debtors explain that this period coincides with the female Debtor taking maternity leave from work to raise two children and the lost income as a result. Section 707(a) provides, in part:

> (a) The court may dismiss a case under this chapter only after notice and a hearing and only for cause, . . . .

11 U.S.C. § 707(a)(West 2004)

Quoting from a Sixth Circuit case, our circuit has cautioned that "[d]ismissal based on lack of good faith ... should be confined carefully and is generally utilized only in those egregious cases that entail concealed or misrepresented assets and/or sources of income, lavish lifestyles, and intention to avoid a large single debt based upon conduct akin to fraud,

misconduct or gross negligence." *In re Tamecki,* 229 F.3d 205, 207 (3rd Cir. 2000) *citing to In re Zick*, 931 F.2d 1124, 1129 (6th Cir.1991). None of these circumstances are present here.

The circumstances of *Tamecki* involved a debtor who incurred credit card debt of $35,000 "just prior to filing for bankruptcy" and at a time when he was earning but 1/10 of that amount. There was no specific calamity or loss that put him into desperate financial straits. The filing was prior to an anticipated divorce that would have pulled into the debtor's individual estate, a $50,000 interest in entireties property that was, on the filing date, unavailable to his creditors.

Those circumstances are not present in the facts before me.

The Debtors' financial circumstances were detailed in testimony before me and include a history of credit card use, student loan obligations, and refinancing of home mortgages both during a time when the Debtors had a significant income stream and when that stream was reduced. Refinancing was used to reduced unsecured obligations. They sought credit counseling at least twice prior to bankruptcy. There is no indication that the timing of the filing was used to thwart creditors or prevent their access to a significant asset. On the contrary, charges and cash advances were minimized within the year before filing with payments on the credit cards exceeding those charges and continuing until shortly before filing. Testimony was presented as to the significant sums that were paid on this debt on a regular basis as well as the pride they took in paying these obligations on time.

No challenge was made to the accuracy of the information provided by the Debtors in their schedules. Their testimony was sincere. There was no specific indication of an extravagant lifestyle.

The Movant would have the Court adopt a standard that would require dismissal for cause in those cases where lifestyle adjustments over time would have prevented the need for the filing of bankruptcy. I have generally found that most bankruptcy filings occur as a result of poor financial decisions. Certainly, if Congress were to adopt such a restriction it would represent a significant departure from existing precedent. In the absence of specific statutory directive, I decline to adopt the Movant's standard.

In conclusion, when I look at the totality of the circumstances applicable to § 707(a), I find that this case should not be dismissed for cause since I find that the Debtors have filed their Chapter 7 in good faith.

My Orders will follow.

Date: October 14, 2005

John J. Thomas, Bankruptcy Judge
(CMS)

*This electronic opinion is signed and filed on the same date.*